UNITED STATES of America,
Plaintiff-Appellee,

v.

Larry Burdette JOHNSON,
Defendant-Appellant.

No. CA 78–2736.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 11, 1979.

Decided Aug. 29, 1980.

---

Jeffrey G. Howe, Asst. U.S. Atty., Boise, Idaho, for defendant-appellant.

Randall D. Schulthies, Pocatello, Idaho, for plaintiff-appellee.

Before WRIGHT, GOODWIN, Circuit Judges, and SPENCER WILLIAMS,* District Judge.

SPENCER WILLIAMS, District Judge:

Larry Burdette Johnson was convicted of one count of assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1153[1] and 113(f)[2] (1976). On this appeal, Johnson raises several instances of claimed error which occurred during his trial, the most important of which was the trial court's refusal to deliver lesser included offense jury instructions. We conclude that the failure to give such instructions was reversible error.

---

* Honorable Spencer Williams, United States District Judge for the Northern District of California, sitting by designation.

[1]. The Major Crimes Act, 18 U.S.C. § 1153 (1976) provides:

Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

As used in this section, the offenses of burglary and incest shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

In addition to the offenses of burglary and incest, any other of the above offenses which are not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.

[2]. 18 U.S.C. § 113 (1976) provides:

Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

(a) Assault with intent to commit murder or rape, by imprisonment for not more than twenty years.

(b) Assault with intent to commit any felony, except murder or rape, by fine of not more than $3,000 or imprisonment for not more than ten years, or both.

(c) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by fine of not more than $1,000 or imprisonment for not more than five years, or both.

(d) Assault by striking, beating, or wounding, by fine or not more than $500 or imprisonment for not more than six months, or both.

(e) Simple assault, by fine of not more than $300 or imprisonment for not more than three months, or both.

(f) Assault resulting in serious bodily injury, by fine of not more than $10,000 or imprisonment for not more than ten years, or both.

# I

## FACTS

■ Johnson, an Indian,[3] was charged with two counts of assault resulting in serious bodily injury. The charges stemmed from an incident occurring within the boundaries of the Fort Hall Indian Reservation on or about April 23, 1978.[4] The victim in Count I was Edwin Papse, and the victim in Count II was Richard Johnson, appellant's father.[5] Both victims are Indians.[6]

During the day of April 22, 1978, Johnson, the victims, and others were drinking alcoholic beverages in Blackfoot, Idaho, a short distance from the Fort Hall Indian Reservation. Later that day these individuals went to Johnson's residence on the Fort Hall Reservation. In the late evening or early morning, Johnson had an argument with his wife. Afterwards, he allegedly struck Papse and Richard Johnson with the blunt end and handle of a long-handled ax. Papse slept at the house that evening, and the next day walked to the home of a neighbor who transported him to a nearby hospital. He was treated there by Dr. Gary K. Haddock.

At Johnson's trial, the United States called Papse as a witness. A long-handled ax was offered into evidence during his testimony. Pursuant to a search warrant, this ax had been seized at Johnson's residence five days after the assault. Papse identified the ax, apparently with some hesitancy, as the weapon used to commit the assault on him. Over Johnson's objection that there had been insufficient foundation or authentication, the ax was admitted into evidence.

Dr. Haddock was called by the United States and testified about the nature and extent of Papse's injuries. Over objection, Haddock was allowed to state his opinion that Papse suffered "serious bodily injury."

In an instruction to the jury, the court defined "serious bodily injury" to include bodily injury which involves unconsciousness. Johnson timely objected to this instruction.

The trial judge did not instruct the jury that it could find Johnson guilty of any lesser included offenses. Johnson objected to this failure, and suggested three lesser included offenses. The court ruled that two of the suggested offenses were not federal crimes in Indian country, and hence could not be lesser included offenses, and that the third suggested offense was not a lesser included offense because it contained

---

3. The record does not disclose whether Johnson or either of his two alleged victims are enrolled members of any tribe. At trial, the parties introduced a stipulation providing simply that the three men "are all Indians." See Reporter's Transcript at 112. The Supreme Court has noted that federal jurisdiction under the Major Crimes Act does not apply to every individual racially classified as Indian, but at the same time the Court specifically refrained from deciding whether or not nonenrolled Indians are subject to federal jurisdiction under the Act. *United States v. Antelope*, 430 U.S. 641, 646 n. 7, 97 S.Ct. 1395, 1398, 51 L.Ed.2d 701 (1977). In a recent opinion, this court recognized that although "[e]nrollment is the common evidentiary means of establishing Indian status, . . . it is not the only means nor is it necessarily determinative." *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979). Proof of enrollment, therefore, was not necessary in the present case, and we hold the parties' stipulation was adequate to establish the status of Johnson and his victims as "Indians" within the meaning of the Major Crimes Act, thereby satisfying this prerequisite to federal court jurisdiction under that Act. *But cf. United States v. Heath*, 509 F.2d 16, 19 (9th Cir. 1974) (Klamath Indians were no longer subject to federal court jurisdiction founded on the Major Crimes Act following congressional termination of their tribal status).

4. For the purposes of federal court jurisdiction under the Major Crimes Act, the Fort Hall Indian Reservation is considered "Indian country." 18 U.S.C. § 1151(a) (Supp. I 1977). The parties stipulated at trial that the residence at which the alleged assault occurred is located within the boundaries of the reservation and within "Indian country." See Reporter's Transcript at 112.

5. In order to avoid confusion, appellant's father will be referred to as "Richard Johnson." When used alone, *Johnson* refers to appellant and not to his father.

6. See note 3, *supra*.

elements not included in the original charge.

The jury returned a verdict of guilty as to Count I (assault on Papse) and not guilty as to Count II (assault on Richard Johnson). A sentence of ten years imprisonment was imposed. This appeal followed.

## II

### STATUTORY FRAMEWORK

Some familiarity with the historical development of federal criminal jurisdiction over Indians in Indian country is a useful starting point for analysis of several of the major issues presented by this case. "[T]he various Indian tribes were once independent and sovereign nations, and . . . their claims to sovereignty long predates that of our own Government." *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). But when the tribes' status changed to that of dependency, subject to the overriding sovereignty of the United States, their authority as independent sovereigns was implicitly and necessarily limited in certain fundamental respects. As dependent sovereigns, the tribes' "exercise of separate power is constrained so as not to conflict with the interests of [the United States'] overriding sovereignty." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209 (1978).[7]

This is not at all to say the Indian tribes were divested of all significant attributes of sovereignty. On the contrary, in the early 1830s two landmark Supreme Court opinions authored by Mr. Chief Justice Marshall, *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), and *Worcester*

*v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), firmly established the legal basis for the doctrine of inherent powers of limited sovereignty which remain vested in the Indian tribes unless extinguished by congressional act or surrendered by treaty. One aspect of this retained inherent tribal sovereignty is the exclusive power to prescribe tribal criminal laws and mete out punishment to tribal offenders. *United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 1087, 55 L.Ed.2d 303 (1978); *Oliphant*, 435 U.S. at 210, 98 S.Ct. at 1021; *Ex parte Crow Dog*, 109 U.S. 556, 572, 3 S.Ct. 396, 406, 27 L.Ed. 1030 (1883).

■ Prior to 1885, there existed no explicit congressional enactment permitting the federal courts to exercise any criminal jurisdiction over Indians who had committed crimes against other Indians on Indian land. The implication of the absence of express congressional authorization was made clear when Crow Dog killed Chief Spotted Tail of the Brule Sioux in Indian country, and the Supreme Court ruled he could not be tried for murder in a federal court. *Ex parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883). Congress responded by passing the Major Crimes Act of 1885, ch. 341, § 9, 23 Stat. 385. This Act conferred jurisdiction on the federal courts to punish certain enumerated offenses committed by Indians in Indian country. The Act "reflected a view that tribal remedies were either nonexistent or incompatible with principles that Congress thought should be controlling." *Keeble v. United States*, 412 U.S. 205, 210, 93 S.Ct. 1993, 1996, 36 L.Ed.2d 844 (1973); *see generally id.* at 209–12, 93 S.Ct. at 1996–1997. Its list of enumerated offenses has been codified at 18 U.S.C. § 1153.[8]

---

**7.** For example, implicit divestitures of Indian tribal authority have been found to restrict alienability of tribal lands, *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 667–68, 94 S.Ct. 772, 777, 39 L.Ed.2d 73 (1974); *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 574, 5 L.Ed. 681 (1823), to prohibit direct commercial or governmental relations with foreign nations, *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17–18, 8 L.Ed. 25 (1831),

and to forbid criminal prosecutions of nonmembers of a tribe in its tribal courts, *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 210, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209 (1978).

**8.** Seven crimes were enumerated when the Act was passed in 1885. The list of enumerated crimes has undergone several revisions since 1885, and the number of enumerated crimes presently stands at thirteen. See note 1, *supra,*

■ The Supreme Court has recognized the Major Crimes Act as a "carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land." *Wheeler*, 435 U.S. at 325 n. 22, 98 S.Ct. at 1087. Thus, except for the crimes specifically enumerated in section 1153, the general rule is that tribal courts have retained exclusive jurisdiction over all crimes committed by Indians against other Indians in Indian country. 18 U.S.C. § 1152. *See United States v. Antelope*, 430 U.S. 641, 643 n. 2, 97 S.Ct. 1395, 1397, 51 L.Ed.2d 701 (1977); *United States v. Jackson*, 600 F.2d 1283, 1286 (9th Cir. 1979).[9]

■ The only forms of assault enumerated in 18 U.S.C. § 1153 before 1968 were assault with a dangerous weapon, assault with intent to kill, and assault with intent to commit rape. All other forms of assault by Indians against Indians in Indian country were punishable solely in the tribal courts. Tribal courts, however, had been limited to imposing criminal sentences not exceeding six months, and Congress became concerned that serious assaults within the tribal courts' exclusive jurisdiction would not be punished adequately. Consequently, section 1153's list of enumerated offenses was amended in 1968 to include assault resulting in serious bodily injury. Act of April 11, 1968, Pub.L.No.90–284, Title V, § 501, 82 Stat. 80.[10]

■ When originally added to section 1153, assault resulting in serious bodily injury was included in a category of enumerated offenses which were required to be "defined and punished in accordance with the laws of the State in which such offense was committed." 18 U.S.C. § 1153 (1970) (amended 1976). This feature of section 1153 produced unfortunate results. Indians prosecuted for those enumerated offenses governed by state law often faced harsher definitions and penalties than non-Indians prosecuted for the same offenses, for non-Indians were subject to federal definitions and penalties pursuant to 18 U.S.C. § 1153.[11] To correct the unequal and possi-

---

for the current amended version of 18 U.S.C. § 1153.

9. Exceptions to this rule have been recognized where a federal law of general applicability, as opposed to federal enclave law, is involved, *e. g., United States v. Burns*, 529 F.2d 114, 117 (9th Cir. 1976); *Stone v. United States*, 506 F.2d 561, 563 (8th Cir. 1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975); *Walks On Top v. United States*, 372 F.2d 422, 425 (9th Cir. 1967), *cert. denied*, 389 U.S. 879, 88 S.Ct. 109, 19 L.Ed.2d 170 (1967); *but see United States v. Smith*, 562 F.2d 453, 456 (7th Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978) (questioning the reasoning of *Stone* regarding federal laws of general applicability), and where the crime is "peculiarly federal," *e. g., United States v. Smith*, 562 F.2d at 458; *see* H.R.Rep.No.1038, 94th Cong., 2d Sess. 3 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1125, 1127.

10. The legislature's purpose was explained as follows:

This title adds "assault resulting in serious bodily injury" to the "Major Crimes Act." Without this amendment an Indian can commit a serious crime and receive only a maximum sentence of 6 months. Since Indian courts cannot impose more than a 6-month sentence, the crime of aggravated assault should be prosecuted in a Federal court, where the punishment will be in proportion to the gravity of the offense.
S.Rep.No.721, 90th Cong., 1st Sess. 32 (1967) *reprinted in* [1968] U.S.Code Cong. & Admin. News, pp. 1837, 1866.

11. The general rules of state and federal criminal jurisdiction over persons committing any of the § 1153 enumerated offenses in Indian country are as follows:

1. *Indian against Indian crimes* are subject to federal jurisdiction under § 1153.

2. *Indian against non-Indian crimes* are subject to federal jurisdiction under either § 1152 or § 1153. *See* H.R.Rep.No.1038, 94th Cong., 2d Sess. 3 *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1125, 1126.

3. *Non-Indian against Indian crimes* are subject to federal jurisdiction under § 1152.

4. *Non-Indian against non-Indian crimes* are subject to state jurisdiction under *United States v. McBratney*, 104 U.S. 621, 26 L.Ed. 869 (1881), and other Supreme Court cases which have followed. *McBratney* held that absent contrary treaty provisions or explicit congressional action, federal courts lacked jurisdiction over such crimes, and state courts possessed the exclusive power to try and punish such offenders. *Id.* at 623–24.

There is a major exception to this jurisdictional scheme. Several federal laws have con-

bly unconstitutional treatment of Indian defendants, Congress passed the Indian Crimes Act of 1976, Pub.Law No.94–297, 90 Stat. 585 (codified at 18 U.S.C. §§ 113, 1153 (1976)), shifting assault resulting in serious bodily injury and several other enumerated offenses into the category of crimes defined and punished in accordance with federal law. *See generally* H.R.Rep.No.94–1038, 94th Cong., 2d Sess. 1–5 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1125, 1125–29.

■ Where section 1153 provides for an enumerated offense to be defined and punished in accordance with federal law, *i. e.*, the law governing areas "within the exclusive jurisdiction of the United States," it refers to the law in force in federal enclaves. Criminal assaults have been defined for federal enclaves since at least as early as 1825. *See* Act of March 3, 1825, ch. 65, § 22, 4 Stat. 121 (repealed 1909). The current provisions regarding punishable assaults in federal enclaves may be traced directly to the Act of March 4, 1909, ch. 321, § 276, 35 Stat. 1143 (current version codified at 18 U.S.C. § 113 (1976)). As originally enacted, and for more than 67 years thereafter, these provisions did not include assault resulting in serious bodily injury. It was not until Congress decided in 1976 that the enumerated offense of assault re-

ferred upon some states complete or concurrent criminal jurisdiction over categories 1–3. *See, e. g.,* 18 U.S.C. § 1162 (1976).

No problems of unequal treatment arise between categories 2 and 3. The fact that defendants in categories 2 and 4 may be treated unequally was held not to violate the Due Process Clause of the Fifth Amendment in *United States v. Antelope*, 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), *rev'g United States v. Antelope*, 523 F.2d 400 (9th Cir. 1975), since "[t]he Federal Government treated [Indian defendants] in the same manner as all other persons within federal jurisdiction." *Id.* 430 U.S. at 649, 97 S.Ct. at 1400.

The disparity in treatment under discussion in the text existed between categories 1 and 3 when the offense happened to be one of those, such as assault resulting in serious bodily injury, which § 1153 required to be defined and punished according to state law. The constitutionality of this disparity was considered by this court in *United States v. Cleveland*, 503 F.2d 1067 (9th Cir. 1974):

sulting in serious bodily injury should be defined and punished in accordance with federal law that it became necessary to provide the substantive federal criminal law underlying this offense. Therefore, as part of the Indian Crimes Act, Congress amended 18 U.S.C. § 113 by adding this form of assault. Pub.L.No.94–297, § 3, 90 Stat. 585 (codified at 18 U.S.C. § 113(f)). *See* H.R. Rep.No.1038, 94th Cong., 2d Sess. 6 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 1125, 1129–30.

With this groundwork of the statutory development in place, we proceed to consider the question of the trial court's refusal to give the requested lesser included offense instructions.

### III

### LESSER INCLUDED OFFENSES

The trial court refused Johnson's request that the jury be instructed on the following offenses Johnson contended were lesser included offenses: (1) the felony offense of assault with a dangerous weapon with intent to do bodily harm, 18 U.S.C. § 113(c); (2) the petty offense of assault by striking, beating, or wounding, 18 U.S.C. § 113(d); and (3) the petty offense of simple assault, 18 U.S.C. § 113(e). The trial court's action raises a number of interesting and some-

The sole distinction between the defendants who are subjected to state law and those to whom federal law applies is the race of the defendant. No federal or state interest justifying the distinction has been suggested, and we can supply none. The 1966 and 1968 amendments to section 1153 as applied to adopt Arizona law in defining and punishing assault with a dangerous weapon and assault resulting in serious bodily injury alleged to have been committed by an Indian against an Indian are violative of the equal protection requirement of the Fifth Amendment.

503 F.2d at 1071. A similar result was reached by the Eighth Circuit in *United States v. Big Crow*, 523 F.2d 955, 960 (8th Cir. 1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). The Tenth Circuit, however, reached the opposite conclusion in *United States v. Analla*, 490 F.2d 1204, 1208 (10th Cir. 1974), *vacated and remanded on other grounds*, 419 U.S. 813, 95 S.Ct. 28, 42 L.Ed.2d 40 (1974).

what subtle legal questions touching federal criminal procedure, federal substantive criminal law, and federal Indian law. It has been said "[t]he doctrine of lesser included offenses is not without difficulty in any area of the criminal law." *Fuller v. United States*, 407 F.2d 1199, 1228 (D.C.Cir. 1968) (en banc), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969). The legal issues which must be addressed in applying the lesser included offense doctrine to the present case represent no exception to this statement.

### A. *Applicable Legal Standards*

██ Rule 31(c) of the Federal Rules of Criminal Procedure provides that a defendant may be found guilty of an offense "necessarily included" in the offense charged.[12] Although the included offense doctrine originally was intended to assist the prosecution in cases in which its proof failed to establish all the elements of the charged offense, it is now settled that a defendant has a procedural right to an included offense jury instruction in an appropriate case. *Keeble*, 412 U.S. at 208, 93 S.Ct. at 1995; *Sansone v. United States*, 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965); *Berra v. United States*, 351 U.S. 131, 134, 76 S.Ct. 685, 687, 100 L.Ed. 1013 (1956); *Stevenson v. United States*, 162 U.S. 313, 314–15, 16 S.Ct. 839, 40 L.Ed. 980 (1896). The purpose of this rule is to avoid the situation in which the jury, convinced that the defendant is guilty of some crime, is tempted to convict him of the charged offense even though the prosecution has failed to make out one or more of the elements of that offense:

> True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the

jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.

*Keeble*, 412 U.S. at 212–13, 93 S.Ct. at 1998 (emphasis in original). This is not at all to say that the defendant's procedural right to an included offense instruction is based on some supposed notion of the jury's compassion or leniency. In this connection, we accept the statement that "[a]n element of the mercy-dispensing power is doubtless inherent in the jury system, and may well be a reason why a defendant seeks a lesser included offense instruction, but it is not by itself a permissible basis to justify such an instruction." *Kelly v. United States*, 370 F.2d 227, 229 (D.C.Cir.1966), *cert. denied*, 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1967). Rather, "[a] lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense," *Sansone*, 380 U.S. at 350, 85 S.Ct. at 1009, and "the evidence would permit [the] jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater." *Keeble*, 412 U.S. at 208, 93 S.Ct. at 1995.

██ Establishing entitlement to an included offense instruction is therefore a two-step process: (1) a lesser included offense must be identified, and (2) a rational jury must be able to find the defendant

---

12. Rule 31(c) provides:

> (c) Conviction of Less Offense. The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense.

The Notes of the Advisory Committee explain that Rule 31(c) "is a restatement of existing law." Rule 31(c)'s origin may be found in the Act of June 1, 1872, § 9, 17 Stat. 198 (formerly codified at 18 U.S.C. § 565). This court has observed that the two terms *lesser included* and *necessarily included* are used interchangeably by the courts, and that Rule 31(c) covers both. *Olais-Castro v. United States*, 416 F.2d 1155, 1157 (9th Cir. 1969).

guilty of the included offense but innocent of the greater offense. In considering satisfaction of the latter prerequisite in a given case, the evidence presented at trial clearly must be a primary focus of analysis. "[T]he lesser offense must be included within but not, *on the facts of the case*, be completely encompassed by the greater." *Sansone*, 380 U.S. at 350, 85 S.Ct. at 1009 (emphasis supplied). *See United States v. Crutchfield*, 547 F.2d 496, 500–01 (9th Cir. 1977). The case law on this aspect of the included offense doctrine is fairly consistent and straightforward.

■ The same cannot be said of the case law dealing with the problem of actually identifying a lesser included offense. There is, of course, little room for confusion when the relationship between two offenses is such that, as a matter of law, it is impossible ever to commit the greater without also having committed the lesser. The classic example of such a relationship is provided by robbery and larceny. Regardless of the particular facts, larceny will always be a lesser included offense of robbery.[13] But the courts are split on whether the particular facts of a case may justify a lesser included offense instruction even though the relationship between the supposed lesser and greater offenses does not, as with robbery and larceny, necessarily arise in the abstract. Our treatment of this problem will be understood more easily if it occurs within the concrete context of Johnson's request for an instruction on assault with a dangerous weapon with intent to do bodily harm. As is developed in the next section, we follow our opinion in *United States v. Stolarz*, 550 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 851, 98 S.Ct. 162, 54 L.Ed.2d 119 (1977), and approve and apply the "inherent relationship" test to determine existence of an included offense. This test requires an examination of the facts brought out at trial. We are aware that this approach may have implications for double jeopardy law, but we find nothing which persuades us to limit the process of identifying lesser included offenses to a mere theoretical comparison of the elements of two crimes.

**B.** *Assault With a Dangerous Weapon With Intent to Do Bodily Harm*

*1. The "Inherent Relationship" Test*

The trial court refused to instruct on assault with a dangerous weapon with intent to do bodily harm, 18 U.S.C. § 113(c), reasoning that this crime is not a lesser included offense in this case because it contains two elements, *viz.*, use of a dangerous weapon and intent to do bodily harm, not necessary to make out assault resulting in serious bodily injury under 18 U.S.C. § 113(f). The trial court apparently believed section 113(c) could *never* be an included offense of section 113(f), regardless of both the particular facts of the case and the particular theories under which the prosecution may have proceeded. Instead, it relied on a simple, mechanical analysis of the two provisions, and since assault resulting in serious bodily injury can be committed without necessarily using a dangerous weapon or even intending any bodily harm, it followed that section 113(c) could not be considered an included offense.

A brief review of the evidence presented at trial and the government's theories of the case will make clear why we are hesitant to accept the trial court's mechanical approach to the problem. The government sought a conviction on Count I by attempting to prove Papse suffered serious bodily injury in the form of extensive and widespread bruises, several lacerations, at least two broken bones, possible momentary loss of consciousness, and severe pain as a result of being beaten by Johnson with an ax. The government never suggested the possibility that any weapon other than an ax was employed: Papse so testified, an ax was introduced into evidence, and the prosecutor made a point of securing Dr. Haddock's agreement on the record that the injuries could have been inflicted by an ax

---

**13.** Likewise, the petty offense simple assault will always be an included offense of assault

resulting in serious bodily injury. See Section III(C), *infra*.

wielded in the manner Papse described. The government does not contend, nor could it reasonably do so, that a long-handled ax is not a "dangerous weapon" within the meaning of 18 U.S.C. § 113(c). Nor does the government argue Johnson did not have an "intent to do bodily harm" to Papse, and in our view, evidence that Johnson did inflict the plethora of injuries Papse sustained would support an inference that Johnson intended bodily harm. Nevertheless, the trial court ruled and the government argues on this appeal that assault with a dangerous weapon with intent to do bodily harm cannot be considered a lesser included offense in this case.

Supreme Court cases in this area are not very helpful in evaluating the strict approach taken by the trial court. In fact, not one of the five most relevant Supreme Court opinions since 1895 was directly concerned with the issue of identification of the lesser included offense.[14] Four of the five cases dealt with the question of whether there existed any disputed factual issue which would permit the jury rationally to convict of the lesser but acquit of the greater offense, *Sansone*, 380 U.S. at 354–55, 85 S.Ct. at 1011–1012 (no disputed factual issue existed); *Berra*, 351 U.S. at 134–35, 76 S.Ct. at 687–688 (no disputed factual issue existed); *Stevenson*, 162 U.S. at 322–23, 16 S.Ct. at 842 (disputed factual issue did exist); *Sparf v. United States*, 156 U.S. 51, 63–64, 15 S.Ct. 273, 277–278, 39 L.Ed. 343 (1895) (no disputed factual issue existed), and the fifth concerned the appropriateness of giving lesser included offense instructions on nonenumerated offenses in criminal cases brought against Indians pursuant to 18 U.S.C. § 1153, *Keeble*, 412 U.S. at 208–09, 93 S.Ct. at 1995–1996. The Court did state in *Berra* that the defendant's right to an included offense instruction was limited to cases "where some of the elements of the crime charged themselves constitute a lesser crime," 351 U.S. at 134, 76 S.Ct. at 688, but the Court did not specify whether it intended to restrict the meaning of "elements" to the abstract "elements" of the offense as found in the statute books or whether it referred instead to the "elements" of the charged offense as proved at trial. The most recent case, *Keeble*, likewise contains nothing purporting to confine identification of lesser included offenses to a theoretical comparison of criminal code sections without any regard for the evidence actually presented in the case. *See Keeble*, 412 U.S. at 208, 93 S.Ct. at 195.

In defending the trial court's mechanistic approach, the government relies on our holding in *Olais-Castro v. United States*, 416 F.2d 1155, 1157 (9th Cir. 1969): "To be necessarily included in the greater offense, the lesser must be such that it is impossible to commit the greater without first having committed the lesser. . . . Stated differently, the offense must not require some additional element not needed to constitute the greater offense." *Olais-Castro* does not, however, specifically or necessarily rule out a factual approach to lesser included offenses.[15]

The government seeks to derive additional support from a footnote in *Olais-Castro* by focusing on the indictment. *Olais-Castro* stated, "[D]efendant cannot attempt to waive his right to notice in order to use the lesser-included offense doctrine. . . . 'What is controlling is the offense charged in the indictment, not the offense estab-

---

14. In *Jeffers v. United States*, 432 U.S. 137, [97 S.Ct. 2207, 53 L.Ed.2d 168] (1977), the Court was presented with a question of whether 21 U.S.C. § 846 (1976) was a lesser included offense of 21 U.S.C. § 848 (1976). The Court found it unnecessary to resolve the question, for it assumed for the purposes of argument that § 848 required proof of every fact necessary to establish a violation of § 846 plus proof of certain additional elements. 432 U.S. at 149–50 [97 S.Ct. at 2215].

15. Indeed, the opinion recognizes a difference between "necessarily included" and "lesser included" offenses:

As observed in 8 Moore's Federal Practice (2d ed.),
31.03:
"The former denotes a relationship which always exists between two offense categories, such as larceny and robbery, regardless of the facts of a particular case. The latter depends upon particular facts."
416 F.2d at 1157 n. 3.

lished by the trial proof . . . .' " 416 F.2d at 1159 n. 9 (quoting *Kelly v. United States*, 370 F.2d 227, 229 (D.C.Cir.1966), *cert. denied*, 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1967)). Since the indictment in the present case makes no mention of either of the two so-called "additional elements" contained in the section 113(c) offense, a dangerous weapon and intent to do bodily harm, the government contends Johnson received no warning that he might be convicted under section 113(c), the prosecutor thereby was prohibited from requesting an instruction on that offense, and the same prohibition applied to Johnson because the defendant's right to invoke the lesser included offense doctrine "does not extend beyond the right of the prosecutor." *Olais-Castro*, 416 F.2d at 1159 n. 9 (quoting *Kelly*, 370 F.2d at 229).

We treated the subject of included offenses more recently in *United States v. Crutchfield*, 547 F.2d 496, 500 (9th Cir. 1977). Since all parties to that action agreed a lesser included offense existed based on the face of the statutes alone, we needed only concern ourselves with whether or not there were disputed factual elements justifying instructing the jury on the included offense. It was unnecessary to consider the proper means of identifying a lesser included offense, and *Crutchfield* therefore does not contribute to understanding the lesser included offense doctrine or analyzing the proposed lesser included offense in the instant case.

Far more relevant to the question here was our next opinion dealing with the lesser included offense doctrine, *United States v. Stolarz*, 550 F.2d 488 (9th Cir. 1977), *cert. denied*, 434 U.S. 851, 98 S.Ct. 162, 54 L.Ed.2d 119 (1977). *Stolarz* bears important resemblances to the present case, and warrants some extended discussion. While a federal prisoner, defendant Stolarz had been accused of stabbing another prisoner and had been charged with assault with intent to commit murder in violation of 18 U.S.C. § 113(a). Over his objection, the trial court had granted the government's request for a jury instruction that he could be acquitted of the charged offense and

found guilty of assault with a dangerous weapon with intent to do bodily harm, 18 U.S.C. § 113(c), as a lesser included offense. Making many of the same arguments advanced by the government in the present case, Stolarz had contended "the statutory definition of the two crimes precluded the giving of a lesser included offense instruction" because "a conviction under Section 113(c) requires proof of the use of a dangerous weapon while an assault with intent to commit murder under Section 113(a) may be committed without using a dangerous weapon." 550 F.2d at 491. The court responded to Stolarz's arguments as follows:

We cannot accept appellant's mechanistic approach to the determination of this question. "To determine that two offenses in a given case are in the relation of greater and lesser included offense is not as simple as defining the elements of the two offenses separately and laying them side by side, for this area of the law is encrusted with much ancient lore." *United States v. Whitaker*, 144 U.S.App. D.C. 344, 447 F.2d 314, 318 (1971). After consideration of the language of Rule 31(c), Federal Rules of Criminal Procedure, and prior cases, the *Whitaker* court concluded that the proper test is whether there is an "inherent" relationship between the greater offense and the crime alleged to be a lesser included offense. By this, the court meant that the two offenses "must relate to protection of the same interests, and must be so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense." *Id.* at 319. We are in accord with this description of the test for determination of a lesser included offense and proceed to apply it to the offenses involved herein.

550 F.2d at 491. The court concluded that both the offenses at issue "relate[d] to protection of the same interest in preventing and punishing assaults within federal jurisdictions," and it observed that "[w]hile all assaults with intent to commit murder

do not involve the use of a dangerous weapon, . . . such assaults are commonly perpetrated by use of a dangerous weapon." *Id.* Accordingly, the court ruled section 113(c) could be a lesser included offense of 113(a), though this relationship would not always exist on the facts of every case. Obviously, if we employ the "inherent relationship" test adopted in *Stolarz*, our analysis of Johnson's request for an instruction on section 113(c) will be very different from what it would be if we confined ourselves to examining statutory elements.[16]

Our court has issued two opinions on lesser included offenses more recent than *Stolarz, United States v. Silla*, 555 F.2d 703 (9th Cir. 1977), and *United States v. Raborn*, 575 F.2d 688 (9th Cir. 1978). *Silla* was similar to *Crutchfield* in that the identification of the lesser included offense was not in question, but the existence of a disputed factual element justifying a jury instruction was contested. *Raborn* upheld the trial court's refusal to give a requested lesser included offense instruction, but did so without the need for extended discussion of the doctrine. Though *Raborn* cited *Stolarz*, it had no occasion to expand upon *Stolarz's* treatment of lesser included offenses or its adoption of the "inherent relationship" test.

Conflicting approaches have characterized opinions delivered by other circuit courts which have wrestled with the issue of determining included offenses. For example, the Third Circuit has rejected consideration of evidence adduced at trial, taking instead a position similar to that urged by the government in the present case: "the proper test focuses on the evidence necessary to prove the statutory elements." *Government of Virgin Islands v. Smith*, 558 F.2d 691, 696 (3d Cir. 1977), *cert. denied*, 434 U.S. 957, 98 S.Ct. 486, 54 L.Ed.2d 316 (1977).[17] In the District of Columbia Circuit, on the other hand, the strict statutory comparison preferred in earlier cases such as *Kelly v. United States*, 370 F.2d 227 (D.C.Cir.1966), *cert. denied*, 388 U.S. 913, 87 S.Ct. 2127, 18 L.Ed.2d 1355 (1967), was replaced with the "inherent relationship" test in *United States v. Whitaker*, 447 F.2d 314 (D.C.Cir. 1971), the case upon which *Stolarz* relied so heavily.[18] See *also United States v. Kearney*, 498 F.2d 61, 64 (D.C.Cir.1974) (holding identification of lesser included offense "will depend not solely upon a comparison of the statutory requirements for the respective crimes but also upon an analysis of the facts of the offense as charged in each indictment and as proved at trial"). More recently, the Tenth Circuit has approved the "inherent relationship" test, citing both

---

**16.** In spite of its importance, the parties were either unaware of *Stolarz* or chose to ignore it, for neither side has cited or discussed the case.

**17.** In *Government of Virgin Islands v. Smith*, the defendant had been tried originally on a two-count indictment charging him with murder and with possession of a dangerous weapon, the knife used to commit the murder. The jury convicted him of the latter but could not agree on a verdict on the murder count. Subsequently, the defendant was convicted of the murder by another jury. On appeal, he argued the former jeopardy principle barred his retrial for murder when he had already been convicted on the weapons charge. His legal theory was based on the principle that lesser and greater offenses are the "same" offense for double jeopardy purposes. See *Brown v. Ohio*, 432 U.S. 161, 168, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977). After noting that the "[c]ase law in the state courts is conflicting as to whether it is the evidence adduced at trial or that demanded by the definition of the offense which provides the test for determining the inclusion of one offense within another," the court pronounced

the test it had decided to follow and compared the statutory elements of the two crimes. 558 F.2d at 696. Since murder can be accomplished without using any weapon, the court found no lesser-greater offense relationship. The court did not discuss the "inherent relationship" test. We note that had that test been applied, satisfaction of that portion which focuses on the interests protected by the respective criminal statutes would have been much more problematic than was the case with the two assault provisions in *Stolarz*.

**18.** *Whitaker* ruled a lesser included offense instruction should have been given on unlawful entry in a case in which the offense charged was burglary. Although a burglary could be committed without making an unlawful entry, the facts proved at trial established the elements of the offense of unlawful entry and the two offenses violate the same interest of the property owner in protecting the integrity of his premises. 447 F.2d at 319.

**1238**

*Stolarz* and *Whitaker* as authority. *United States v. Pino*, 606 F.2d 908, 916 (10th Cir. 1979) (holding "the availability of the lesser-included-offense instruction should be decided in practical terms of the evidence developed in this case on the offense charged" (emphasis in original)).[19] An intermediate position of sorts appears to have been adopted by the Seventh Circuit in which the primary focus is on the facts alleged in the indictment. *United States v. Stavros*, 597 F.2d 108, 112 (7th Cir. 1979).[20]

■ We are persuaded of the wisdom of the "inherent relationship" test and its applicability to this case. We adhere to *Stolarz*, following also *Whitaker* and *Pino*. The mechanical comparison of statutory elements the government invites us to make may be appealing in its promise of certainty and intellectual purity, but its artificiality is unresponsive to the underlying purposes of the lesser included offense doctrine, as is demonstrated by the facts of this case. To the extent we are concerned that a "jury's practice will diverge from theory" and a defendant may be convicted of a crime for which all elements have not been proven, *Keeble*, 412 U.S. at 212, 93 S.Ct. at 1998, it makes no sense to confine our discovery of lesser included offenses to the barren words of the criminal code, uninformed by the evidence introduced at trial. It is, after all, that evidence which would convince the jury the defendant was guilty of some offense, even if something less than the charged offense, and it is therefore that same evidence which gives rise to whatever temptation the jury may feel to convict of the charged offense in spite of a failure of proof as to one or more prerequisites. We therefore hold that a lesser included offense may be established by the evidence adduced

19. The offenses involved in *Pino* were involuntary manslaughter and careless driving. The indictment itself alluded to the use of a motor vehicle, and "[t]he evidence on defendant's operation of the vehicle, the collision, and the victim's death established all the elements of the lesser offense of careless operation of a vehicle." 606 F.2d at 916–17. Unlike *Whitaker* and *Stolarz*, however, the *Pino* court did not state specifically that the two offenses related to protection of the same interests, nor did it explicitly identify what those interests might be.

20. *Stavros* concerned several provisions of the Internal Revenue Code. The court discussed the issues as follows:

The Government argues on the basis of *United States v. Shaffer*, 291 F.2d 689 (7th Cir. 1961), *cert. denied*, 368 U.S. 915, 82 S.Ct. 192, 7 L.Ed.2d 130 (1961), that the punishment for all of the counts was proper. In *Shaffer* this court held that Section 7262 [the proposed lesser included offense] was not a lesser included offense of Section 7203 [the proposed greater offense] because it was possible to violate Section 7203 without violating Section 7262. Although *Shaffer* correctly restates the test for evaluating whether there is a lesser included offense, this conclusion apparently was reached only by examining the language of the two statutes. Section 7203 may be violated in a number of ways, not all of which would also constitute violations of Section 7262. Section 7203 covers numerous forms of willful omissions to comply with the revenue laws, not merely willful failure to pay a tax on wagering. To determine whether the Section 7262 counts constitute lesser

included offenses, however, we do not look to the statutes alone. When a statute can be violated in different ways we must look to the facts alleged in the indictment. *United States v. Kearney*, 162 U.S.App.D.C. 110, 113, 498 F.2d 61, 64 (1974).

597 F.2d at 112. The court seems to have attached significance to the fact that different means of committing the greater offense were spelled out in the statute itself. To know whether or not the suggested lesser offense actually was an included offense, one would refer to the indictment to see how the defendant is alleged to have committed the greater offense. Thus, as to the statutes *Stavros* considered, willful failure to pay a tax on wagering would not be a lesser included offense of § 7203 (which proscribes a number of different willful acts including failure to pay) if, for example, the indictment alleged that the violation of § 7203 consisted of a willful failure to keep required records (which is also covered by § 7203). Once the manner in which § 7203 was alleged to have been violated had been determined from the indictment, *Stavros* actually employed a mechanical analysis, perhaps because nothing more was needed to identify the lesser included offenses in that case. Its citation to *Kearney* is somewhat puzzling in light of the mechanical analysis the *Stavros* court actually followed, though it may be an indication the Seventh Circuit would go beyond the indictment to a consideration of the evidence actually introduced at trial if the indictment alone was insufficient to establish existence of a lesser included offense.

at trial in proof of the greater offense, with the following qualification recognized in both *Stolarz* and *Whitaker*:

> [T]here must also be an "inherent" relationship between the greater and lesser offenses, *i. e.*, they must relate to the protection of the same interests, and be so related that in the general nature of these crimes, though not necessarily invariably, proof of the lesser offense is necessarily presented as part of the showing of the commission of the greater offense.

*Whitaker*, 447 F.2d at 319 (footnote omitted). *See Stolarz*, 550 F.2d at 491. The requirement that an "inherent relationship" existed between the greater and lesser offenses is intended to preclude abuse of the lesser included offense doctrine by defense counsel seeking to appeal to the jury's sense of mercy by requesting instructions on every lesser offense arguably established by the evidence.

▮ A fluid approach to the problem of defining lesser included offenses is also more consistent with the purpose of assisting "the prosecution in cases where the evidence failed to establish some element of the offense charged." *Keeble*, 412 U.S. at 208, 93 S.Ct. at 1995. When it is the prosecution requesting the lesser included offense instruction, however, additional considerations of the defendant's right to notice come into play. This right, grounded in the fifth and sixth amendments, belongs to the defendant, not the prosecution, and it is for his protection. It will be recalled the government has contended a defendant cannot waive his right to notice of elements of lesser included offenses. Based on this premise, the government would limit the range of permissible lesser included offense instructions to those offenses established as included offenses by the allegations of the indictment. By this argument, the government is appealing to the traditional principle of mutuality, but we do not feel that principle should any longer be considered controlling. The footnote from *Olais-Castro* cited by the government was based on the District of Columbia Circuit's opinion in *Kelly. See Olais-Castro*, 416 F.2d at 1159 n. 9. But *Kelly*'s position on mutuality has been repudiated in *Whitaker*: "[D]espite the patina of antiquity, considerations of justice and good judicial administration warrant dispensing with mutuality as an essential prerequisite to the defense's right to a lesser included offense charge." 447 F.2d at 321. We agree with *Whitaker*. There is no longer any compelling reason for symmetry between the rights of defendants and prosecutors to invoke the lesser included offense doctrine. Indeed, if we restricted ourselves to an examination of the indictment alone, the prosecution would have the power to limit the defendant's entitlement to such instructions at the very outset of the proceedings. Even if in defining notice to the defendant we look beyond the indictment to the proof offered in the case and the government's trial contentions, *see Stolarz*, 550 F.2d at 492,[21] we cannot accept the proposition that the defendant's right to an instruction may not extend beyond the government's, particularly in view of the difficulties involved in "making a somewhat hindsight determination that the defense received adequate notice of an included offense charge." *Whitaker*, 447 F.2d at 321.[22]

We are aware that adoption of the "inherent relationship" test for lesser included offenses may have some implications for

---

21. The *Stolarz* court determined ample notice had been given by way of the relationship between the offenses, the language of the indictment, and the government's contentions at trial to justify granting the government's request for a lesser included offense instruction. The court specifically refrained from deciding "whether the 'surplus' language in the indictment [which referred to the dangerous weapon allegedly used] broadened the range of lesser offenses that could be charged beyond those permitted by the 'inherent' relationship test." 550 F.2d at 492 n. 5.

22. *Stolarz* also recognized that "more stringent standards pertain[] to the government's request for [an included offense] instruction" owing "to the question of notice to the defendant that, in a particular case, the charging of one offense includes the possibility of conviction on another offense." 550 F.2d at 492.

the closely related doctrines of double jeopardy. It is not for this opinion to attempt to discern the full extent of those possible implications, but a few comments are in order lest we be suspected of having ignored possibly decisive problems with our approach to defining lesser included offenses.

The Double Jeopardy Clause of the fifth amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." "[T]his deceptively plain language has given rise to problems both subtle and complex . . . ." *Crist v. Bretz*, 437 U.S. 28, 32, 98 S.Ct. 2156, 2159, 57 L.Ed.2d 24 (1978). The primary test used for determining if two statutes define the "same" offense for double jeopardy purposes was set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

As the Supreme Court observed more recently, "[t]his test emphasizes the elements of the two crimes." *Brown v. Ohio*, 432 U.S. 161, 166, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977). *Brown* also reiterated the longstanding rule that a "greater offense is . . . by definition the 'same' for purposes of double jeopardy as any lesser offense included in it," *id.* at 168, 97 S.Ct. at 2226–27, and therefore double jeopardy operates between them. *See also Jeffers v. United States*, 432 U.S. 137, 150–51, 97 S.Ct. 2207, 2215–2216, 53 L.Ed.2d 168 (1977).

Statutes such as those treated in *Stolarz*, *Whitaker* and *Pino* would not satisfy the *Blockburger* test, strictly applied, because "each provision requires proof of a fact the other does not." This result raises challenging questions for the applicability of double jeopardy doctrines.

The critical concern located at the core of the Double Jeopardy Clause is that a person should have to stand but once before the power and resources of the state, accused of an offense. *Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957). We know of no logical distinction which might explain why the same principle necessarily could not, or should not, be applied to lesser included offenses defined in the more practical, realistic manner adopted herein.

In addition, as is noted in *Brown*, "[t]he *Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense." 432 U.S. at 166 n. 6, 97 S.Ct. at 2226 n. 61. *See, e. g., In re Nielsen*, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889).

Because the persuasive reasons for giving lesser included offense instructions in appropriate cases are, to a large extent at least, independent of the concerns which give impetus to double jeopardy doctrines, the justifications for giving such instructions in accordance with the "inherent relationship" test would not be significantly diminished even though it were determined double jeopardy should not operate between every set of offenses defined by that test or in every circumstance.

We find nothing in the interplay between the double jeopardy and lesser included offense doctrines which convinces us not to apply the "inherent relationship" test. We now proceed to apply that test to Johnson's request for an instruction on assault with a dangerous weapon with intent to do bodily harm.

## 2. Application of the "Inherent Relationship" Test

■ We are convinced the "necessarily included" requirement of Rule 31(c) was met with respect to the offense of assault with a dangerous weapon with intent to do bodily harm. It is true, as discussed in Section II above, that the offense defined in section 113(c) has been a part of the federal enclave assault statute since that statute took its present form many years ago, while the offense defined in section 113(f) was not added to the list of punishable assaults until 1976. It is also true that the primary pur-

pose of its addition at that time was to give substance to its simultaneous inclusion in the category of 18 U.S.C. § 1153 enumerated crimes defined according to federal law, and that its original enumeration in section 1153 in 1968 had been prompted by perceived inadequacies in tribal court remedies for serious assaults. Nevertheless, in spite of the unique genesis of section 113(f), we conclude it and 113(c) both relate to protection of the same interest in preventing and punishing assaults within federal jurisdictions.[23] *Cf. Stolarz*, 550 F.2d at 491 (18 U.S.C. §§ 113(a) and 113(c) relate to protection of the same interest).[24] Even if section 113(f)'s enactment may be traced ultimately to concerns for preventing and punishing assaults committed by Indians on Indians in Indian country, the offense is now applicable to all persons in all federal enclaves, and, in fact, it will be recalled that equality of treatment for Indian and non-Indian assault defendants was the motive behind the 1976 amendment to section 1153. Congress could have enacted the offense as a separate section, as well as limiting its coverage to Indians had it chosen to do so. That it did not, and that it instead included the offense as one of a number of punishable assaults carrying possible penalties of varying severity, may be taken as an indication that Congress itself conceived of 113(f) as protecting interests closely related to those protected by 113(c) and the other assault provisions.

 Assaults resulting in serious bodily injury need not involve the use of dangerous weapons or actual intent to cause bodily harm, but it cannot be gainsaid that such assaults commonly are carried out

in that fashion. As outlined in Section II(B)(1) above, the proof actually adduced at trial in support of the government's theories in the present case could have supported Johnson's conviction for assault with a dangerous weapon with intent to do bodily harm. In this case, the showing which would have been sufficient to support such a conviction was necessary to prove the crime charged.[25]

The trial court erred in ruling assault with a dangerous weapon with intent to do bodily harm was not a lesser included offense in this case.

### 3. *Disputed Factual Element*

 Having now determined section 113(c) was a lesser included offense of section 113(f) in this case, the question remains whether a disputed factual element exists which would have permitted a rational jury to convict Johnson of section 113(c) and acquit him of section 113(f). The only additional element necessary to convict of the greater offense here was the existence of serious bodily injury. The government argues no jury rationally could have found Papse did not suffer serious bodily injury. This argument is based on certain evidence concerning the nature of Johnson's alleged attack, the description of Papse's injuries, the photographs of Papse admitted as exhibits, and the testimony of Dr. Haddock. Johnson replies by claiming there was a genuine dispute as to the extent and implications of the injuries Papse received, and therefore as to whether they constituted "serious bodily injury."

---

23. Because of this conclusion, we need not decide if a sufficient identity of protected interests is found in the special relationship between these two statutes represented by the fact that they are both § 1153 enumerated offenses and that this is a prosecution under § 1153.

24. In *United States v. Eagle*, 586 F.2d 1193, 1196–97 (8th Cir. 1978), the court focused on the unique origins of § 113(f) in ruling that section and § 113(c) "different as a matter of law." The court does not seem to have placed any significance on the following facts: (1) the

1976 amendment to § 1153 which made § 113(f) necessary arose from Congress' desire to treat Indian and non-Indian assault defendants equally; (2) both § 113(f) and § 113(c) are enumerated offenses and this was a § 1153 prosecution; and (3) § 113(f) is the law for all persons in all federal enclaves. *Cf. United States v. Knife*, 592 F.2d 472, 483 (8th Cir. 1979) (18 U.S.C. §§ 113(a) and 113(f) are different as a matter of law).

25. Of course, § 113(c) will not invariably be a lesser included offense of § 113(f).

Analysis of this issue is difficult because it requires this court to evaluate evidence and testimony not offered in its presence. In addition, this court does not have the trial court's views on the questions which must now be answered by a review of the record because its erroneous interpretation of the law precluded it from reaching these issues.

Nevertheless, we conclude the requested lesser included offense instruction on section 113(c) should have been given. A jury rationally might have found Papse's injuries were not "serious," as evidenced by the victim's decision not to seek immediate medical attention, his ability to walk around after the assault, the absence of any major internal damage, the absence of any need for surgery, and testimony that he was never in danger of dying, that his only permanent scar would be small, and that the two bone fractures were not of major consequence. In fact, assuming the jury believed Papse's and the government's rendition of the alleged assault, it may have been shocked far more by the frightening image of an attack with a long-handled ax delivered with the obvious intent to injure which Papse's widespread injuries to the head, back, ribcage, and legs indicated than it was by the actual seriousness of the wounds themselves. It is for this very reason that Johnson should have been afforded the protection of an instruction on the lesser offense of assault with a dangerous weapon with intent to do bodily harm. Even though we may be convinced the evidence fully supported a finding that Papse did suffer serious bodily injury, the question is properly left to the jury for resolution. *See Crutchfield,* 547 F.2d at 500–01. Given that the definition of "serious bodily injury" we approve in Section IV relies heavily on the jury's common sense and rejects rigid definitions, it would be particularly inappropriate for this court now to conclude with certainty that a jury would find Papse suffered serious bodily injury within the meaning of section 113(f).

Refusal to instruct on section 113(c) constituted reversible error.

## C. *Simple Assault and Assault by Striking, Beating, or Wounding*

The trial court refused to instruct the jury on assault by striking, beating, or wounding, 18 U.S.C. § 113(d), or on simple assault, 18 U.S.C. § 113(e), concluding that because these two petty offenses are not enumerated in 18 U.S.C. § 1153 they cannot be made lesser included offenses in a case brought against an Indian defendant under that provision. In 1973, however, the Supreme Court had held that an Indian defendant is entitled to the protection of lesser included offense instructions, when warranted by the facts, even though the lesser included offenses are not enumerated in section 1153. *Keeble,* 412 U.S. at 212, 214, 93 S.Ct. at 1997–1998. Government counsel now admit the trial court's reasoning was erroneous, and do not argue on this appeal that the two petty offenses are not lesser included offenses of the charged offense.[26]

---

26. Simple assault "is committed by either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United States v. Dupree,* 544 F.2d 1050, 1051 (9th Cir. 1976). Simple assault is a lesser included offense of assault resulting in serious bodily injury on the basis of the two provisions' statutory elements alone.

The government has not contested defining assault by striking, beating, or wounding as a lesser included offense, but technically it appears the government could have made the same argument here it made in connection with assault with a dangerous weapon with intent to do bodily harm. Assault by striking, beating, or wounding is the equivalent of simple battery. *United States v. Stewart,* 568 F.2d 501, 504–05 (6th Cir. 1978). As such, it contemplates some form of contact, an element of that offense which, strictly speaking, is not required of assault resulting in serious bodily injury. Of course, under the "inherent relationship" test, we would have had no hesitation in defining § 113(d) to be a lesser included offense of § 113(f) even if that issue were contested by the government. *Cf. United States v. Knife,* 592 F.2d 472, 482 (8th Cir. 1979) (§ 113(d) is a lesser included offense of assault with intent to commit murder. 18 U.S.C. § 113(a)).

As discussed in Section III(B)(3) above, the government contends no rational jury could have found Papse did not suffer serious bodily injury. On this basis alone the government continues to deny Johnson had any right to instructions on the petty offenses. For the reasons set forth above, we conclude a rational jury might not have found serious bodily injury, and the government's argument must be rejected.

There is one further consideration not implicated by the request for an instruction on section 113(c) which convinces us instructions on the petty offenses should have been given. Johnson testified he did strike Papse, but that it was a single punch in the face with his fist in response to an attack by Papse. He denied using an ax. Apparently, Johnson was conceding the possibility some of Papse's injuries could have been caused by the punch and Papse's resultant fall, but arguing any other injuries must have been sustained elsewhere. In terms of the offense charged, Johnson's contention is that even if Papse suffered "serious bodily injury," it was not the "result" of any assault by him. This, then, is a second disputed factual issue distinguishing the lesser included petty offenses from the charged offense. For if the members of the jury believe Johnson, they might rationally have concluded he was guilty of assault by striking, beating, or wounding, or of simple assault, and not of assault resulting in serious bodily injury. It is the province of the jury, not the court, to decide whether Johnson's testimony is credible. Yet, absent lesser included offense instructions, the jury had but two alternatives: acquit Johnson despite his admitting hitting Papse, or convict him of the only assault offense charged. For this additional reason, the trial court should have afforded Johnson the protection of the requested petty offense instructions.

Our conclusion that jury instructions should have been given on the petty assaults may require the trial court to confront a difficult question of federal court jurisdiction. If there is a new trial following the remand of this action in which Johnson is convicted of one of the petty assault offenses and acquitted of all other charges, would the trial court have jurisdiction to impose a judgment and sentence on that conviction?

The Court did not consider this question in its ruling in *Keeble*. More recently, the Court alluded to the issue but expressly refrained from deciding it. *United States v. John*, 437 U.S. 634, 636 n. 3, 98 S.Ct. 2541, 2543 n. 3, 57 L.Ed.2d 489 (1978). Three lower federal courts have expressed divergent views.

The two circuits which have addressed the issue have concluded federal court jurisdiction extended to unenumerated lesser included offenses. *United States v. John*, 587 F.2d 683, 688 (5th Cir. 1979) ("*John II*") (dictum), *cert. denied*, 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399 (1979); *Felicia v. United States*, 495 F.2d 353, 355 (8th Cir. 1974), *cert. denied*, 419 U.S. 849 (1974).[27] The *Felicia* court reasoned that because 18 U.S.C. § 1153 subjects Indians committing any enumerated offense "to the same laws and penalties as all other persons" and federal law permits judgments of conviction to be entered on lesser included offenses in other contexts, section 1153 itself must envision such judgments being entered against Indian defendants in instances in which non-Indians would be subject to them. *Felicia*'s reasoning was adopted with little elaboration in *John II*.[28]

---

27. In *United States v. Jackson*, 600 F.2d 1283, 1286 n. 8 (9th Cir. 1979), this court recognized the duty under *Keeble* to instruct on appropriate included offenses which are not enumerated without discussing possible jurisdictional questions arising in connection with the power to sentence on a conviction of the unenumerated lesser offense.

28. The victim in *John II* was not an Indian, and the court concluded federal enclave law applied pursuant to 18 U.S.C. § 1152. Federal court jurisdiction based on § 1152 is not limited to the offenses enumerated in § 1153. It was as an alternative basis for the exercise of jurisdiction that the *John II* court decided to "adopt the reasoning of the Eighth Circuit in *Felicia* . . . and hold that the Supreme Court in *Keeble* implicitly recognized that federal courts have jurisdiction to convict and punish for a

The district court in *United States v. Gilbert*, 378 F.Supp. 82, 94 (D.S.D.1974), however, criticized *Felicia* in dictum, and concluded it was inconsistent with the Major Crimes Act's legislative history and "the general thrust of the legislative history that only the crimes specified in the section were to be punished under it."

Construing section 1153 to permit sentencing on any lesser included offense of any enumerated offense is difficult to harmonize with specific legislative history. Congress' intent was to leave all but the major crimes to the tribes to be dealt with according to their own laws and customs. *See* 16 Cong.Rec. 934 (1885). Accordingly, the Supreme Court recently has accepted the description of the Major Crimes Act as a "carefully limited intrusion of federal power into the otherwise exclusive jurisdiction of the Indian tribes." *Wheeler*, 435 U.S. at 325 n. 22, 98 S.Ct. at 1087 n. 22.

The court in *Felicia* apparently had trouble making sense out of *Keeble* unless jurisdiction to sentence were implied. Both *Felicia* and *John II* cite Justice Stewart's dissent in *Keeble* in which he, too, appears to read the majority's holding as necessarily approving jurisdiction to impose judgment. See *Keeble*, 412 U.S. at 217, 93 S.Ct. at 2000 (Stewart, J., dissenting). Nevertheless, *Keeble* was concerned only with the Indian defendant's right to the same protection afforded non-Indians against being convicted unfairly of the charged offense; it was not concerned with the power of the federal courts to convict and sentence for commission of the lesser included offense.

▮ Furthermore, despite *Felicia*'s assumptions, there may be times when giving the required included offense instruction will be an "exercise in futility" in *Felicia*'s sense of that phrase even if federal courts ordinarily have the power to impose sentence on such offenses. Under 18 U.S.C. § 1152, federal court jurisdiction over Indian defendants committing offenses in Indian country is expressly withheld if the defendant has already been punished by the tribal courts. Unless power to pronounce judgment on an included offense in a prosecution under section 1153 somehow overrides this provision of 1152, a federal court could not impose sentence on any conviction of an included offense for which the defendant had been punished previously by the tribe.[29] Yet, *Keeble* would still require that the instruction be given, for its treatment of the Indian defendant's procedural entitlement to appropriate lesser included offense instructions should make clear that that entitlement does not turn on whether a prior tribal proceeding resulted in punishment for the offense.[30]

It is not necessary for us to decide this jurisdiction issue, for it does not require resolution at this time and may not even arise in this case. While we express no opinion on the merits of the question, we raise these concerns primarily so that the trial court may address them should the issue be presented on remand.[31]

lesser offense included within the enumerated crimes of § 1153." 587 F.2d at 688.

**29.** Because tribal and federal courts are agencies of separate sovereigns, double jeopardy principles do not bar a prosecution by one following a prosecution by the other on the same charge. *Wheeler*, 435 U.S. at 329–30, 98 S.Ct. at 1089.

**30.** *John II* seems to have recognized that the interaction of § 1152 and the *Keeble* lesser included offense instruction requirements might result in instructing on an offense for which no punishment could be imposed. *See* 587 F.2d at 686 n. 6. *John II* does not seem to have determined that this result had any bearing on whether *Keeble* could be interpreted meaningfully without implying the power to

punish for violations of unenumerated lesser included offenses.

**31.** We note that the anomalous result of finding no jurisdiction to impose sentence in these circumstances would be that a doctrine—that of lesser included offenses—originally designed to assist the prosecutor obtain a conviction would be of practical value only to the Indian defendant seeking to avoid a conviction. Unusual, ironic and paradoxical situations are more the rule than the exception where federal Indian law is concerned, however, owing to the unique status of the Indian tribes as quasi-sovereign entities. As the Supreme Court remarked, "[I]t is nonetheless still true, as it was in the last century, that '[t]he relation of the Indian tribes living within the borders of the United States

In view of our decision to reverse, it is appropriate for us now to discuss those of the other issues raised on this appeal likely to recur in a new trial.

## IV

## DEFINING SERIOUS BODILY INJURY

The trial court's jury instruction defining serious bodily injury was as follows: "The term 'serious bodily injury' means bodily injury which involves either of the following: a substantial risk of death or unconsciousness or extreme physical pain or protracted or obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ or mental faculty." Johnson objected to this definition because it did not take into account the duration of any period of unconsciousness. On this appeal, he raises the additional challenge that a substantial risk of death must be present in order to find serious bodily injury. The government has not discussed the latter argument, but in reply to the former it contends Johnson cannot challenge the "unconsciousness" aspect of the jury charge because there was no evidence Papse was knocked unconscious. There was, however, Papse's own testimony that he was knocked "silly" and "dazed" by Johnson's blows. If the jury interpreted this to mean Papse was rendered unconscious, it might have found serious bodily injury based on the disputed portion of the instruction.

"Serious bodily injury" as used in 18 U.S.C. § 113(f) is a phrase which has yet to be defined beyond its own terms by Congress or any published federal court opinion of which we are aware. The reason appears to lie in the fact that the crime has only been defined according to federal law since 1976, and that when section 113(f) was enacted in 1976 the intent of the legislature was focused on providing equal treatment for Indian defendants and not on defining a new felonious assault. As an enumerated offense in 18 U.S.C. § 1153, of course, the history of assault resulting in serious bodily injury began in 1968, but because it was included in the category of enumerated offenses defined and punished according to state law, no independent federal law had developed. If anything, the offense's meaning as a federal crime was only clouded during the years in which state law definitions governed because state laws often differed from one another as well as from the wording of the federal offense itself. *See, e. g., Keeble,* 412 U.S. at 213 n. 13, 93 S.Ct. at 1998 n. 13.

When this offense was first enumerated in section 1153, albeit to be defined by state law, the only relevant legislative history referred to the need for including "aggravated assault" on section 1153's list of crimes. S.Rep.No.721, 90th Cong., 1st Sess., 32 (1967), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 1837, 1866. The lack of any more detailed explication of the common law phrase "serious bodily injury" may be taken to indicate quite simply that Congress never expected or intended rigid, limiting definitions to be applied—or merely that Congress did not consider the question too closely. Since "[t]he common-law meaning of a common-law term used in a federal criminal statute provides a source from which statutory precision may be derived," *United States v. Dupree,* 544 F.2d 1050, 1051 (9th Cir. 1976), an examination of similar state statutes and court decisions is an appropriate means of seeking guidance on this matter.

States with comparable aggravated assault or serious bodily injury statutes have taken a number of somewhat different approaches, although few statutes provide any more precise or detailed definitions than 18 U.S.C. § 113(f).

The instruction given by the trial court in the present case closely followed the definition of "serious bodily injury" contained in the proposed Federal Criminal Code, S. 1437, 95th Cong., 1st Sess., § 111 (1977)

. . . [is] an anomalous one and of a complex character'." *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 173, 93 S.Ct. 1257,

1263, 36 L.Ed.2d 129 (1973) (quoting *United States v. Kagama,* 118 U.S. 375, 381, 6 S.Ct. 1109, 1112, 30 L.Ed. 228 (1886)).

(current version, S. 1722, 96th Cong., 1st Sess. § 111 (1979)). Although the instruction contained elements frequently found in state court formulations, its listing of unconsciousness as a factor defining serious bodily injury appears generally to be without precedent except for S. 1437.

The other components of the court's instruction were matters of degree, and the jury was required to exercise its discretion in making those determinations. Unconsciousness, on the other hand, is specific and clearly identifiable. It either occurred or it did not occur. The terms of the instruction did not permit the jury any room for considering the length of time unconsciousness persisted or the severity of any accompanying injuries: once unconsciousness was found, the case for serious bodily injury had been made out.

For these reasons, the instruction runs counter to the widely held and we believe better view that the existence and definition of serious bodily injury in a given case is primarily a jury question dependent upon an evaluation of all the circumstances of the injury or injuries.

The jury should have been allowed to consider unconsciousness as a factor, but the fact of unconsciousness—much like the fact of broken bones—should not necessarily be determinative.[32]

We reject Johnson's suggestion that a substantial risk of death must be present to constitute "serious bodily injury." This has never been the majority view among state courts construing similar criminal statutes, is not implicit in the common understanding of the term, and almost certainly was not what Congress had in mind when it amended 18 U.S.C. § 1153 to add assault resulting in serious bodily injury to the list of enumerated offenses.

In summary, a jury should be instructed to use its common sense in deciding whether the injuries constitute serious bodily in-

jury. Among the factors the jury should consider are whether the victim suffered extreme physical pain, protracted and obvious disfigurement, protracted loss or impairment of the function of a bodily member, organ, or mental faculty, protracted unconsciousness, and significant or substantial internal damage (such as important broken bones).

A substantial risk of death is a factor to be considered, but it need not be present to find serious bodily injury. The presence or absence of any of these factors is not to be determinative, since the jury must use its own judgment to assess the severity of the injuries.

## V

## EXPERT TESTIMONY

The treating physician, Dr. Haddock, was allowed to give his expert opinion that Papse had suffered serious bodily injury. Johnson contends this testimony was prejudicial and misleading to the jury. We cannot agree.

Federal Rule of Evidence 704 provides that an expert's opinion is not objectionable merely because it addresses an ultimate issue of fact in the case. Johnson seeks to avoid this rule by contending that the prejudicial nature of the testimony outweighs its probative value under Federal Rule of Evidence 403. A similar contention was raised before this court in *United States v. Hearst*, 563 F.2d 1331 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). There the court discussed the Advisory Committee's note on Rule 704 and distinguished expert opinions offered about legal terms which are reasonably clear to laypersons from opinions offered about legal terms which are not reasonably clear to laypersons. Expert opinions concerning understandable terminology were held not objectionable because "[t]he

---

**32.** The trial judge originally intended to instruct the jury that broken bones constituted serious bodily injury. He changed his mind, though, and instead told the jury, "I have decided that every broken bone might not neces-

sarily be a serious injury, and as to whether a broken bone is or is not is something you would have to make your determination on." Reporter's Transcript at 232. The court should have treated unconsciousness similarly.

average layman would . . . ascribe to [those terms] essentially the same meaning intended by the expert witness." 563 F.2d at 1351. Thus, the court in *Hearst* approved of expert testimony concerning the ultimate issue embraced by the term "[to] act under fear of death or grave bodily harm." *Id.*

Likewise, in the present case the legal terminology at issue, "serious bodily injury," is readily understandable to the average layperson. Moreover, the discussion which followed the doctor's rendering of his opinion made it clear his opinion was based on facts which were consistent with the legal definition of "serious bodily injury" which we have approved in the preceding section of this opinion.[33] It is evident that the doctor's opinion was likely to assist the jury in understanding the severity of the harm Papse suffered, and Johnson was free to probe the basis for the expert's conclusion under Federal Rule of Evidence 705. Under these circumstances, it has not been shown the trial court abused its discretion in admitting the expert testimony.

## VI

### ADMISSIBILITY OF THE AX

Johnson argues the ax allegedly used in the assault was admitted into evidence without first being authenticated properly. He contends Papse's testimony was inadequate as authentication because the witness failed to state specifically that he could distinguish this ax from any other, because he did not identify specific characteristics of this ax which could tie it to the incident, and because he appeared to base his identi-

fication largely on an assumption, derived from his belief that this ax was the only ax on the premises, that this ax *must* have been the weapon in question. In addition, Johnson contends the ax introduced into evidence was in a changed condition from the ax noted at the scene of the incident, and for this reason the court should have been especially cautious about its admission.[34]

■ Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The terms of the Rule are thus satisfied, and the proffered evidence should ordinarily be admitted, once a prima facie case has been made on the issue. *See* 5 Weinstein's Evidence § 901(a)[01], at 901–16 (1976). At that point the matter is committed to the trier of fact to determine the evidence's credibility and probative force. *See United States v. Oaxaca*, 569 F.2d 518, 526 (9th Cir. 1978), *cert. denied*, 439 U.S. 926, 99 S.Ct. 310, 58 L.Ed.2d 319 (1978).

■ Here, although the trial record reveals the identification of the ax made by Papse may not have been entirely free from doubt, the witness did state that he was "pretty sure" this was the weapon Johnson had used against him, that he saw the ax in Johnson's hand, and that he was personally familiar with this particular ax because he had used it in the past. Based on Papse's testimony, a reasonable juror could have found that his ax was the weapon allegedly used in the assault. Papse's ability or inability to specify particular identifying fea-

---

**33.** Although Dr. Haddock agreed Papse was not in danger of dying, he still testified Papse had suffered serious bodily injury. To Johnson, this indicates a potentially misleading conflict exists between Dr. Haddock's medical definition of serious bodily injury and the proper legal definition. Since we have rejected Johnson's view that a substantial risk of death is a necessary element of serious bodily injury, we find in this testimony no conflict between Dr. Haddock's medical definition of that term and our legal definition.

**34.** Johnson inaccurately states in his brief that testimony revealed the ax observed at the crime scene had "blood and hair upon the blade end of it." In fact, the testimony was that Rose Edmo, a witness, had been told by Barney Dixie, another witness, only that "there was hair on the axe." Reporter's Transcript at 101. The ax admitted as an exhibit did not have hair on it. Assuming the testimony about the hair is believed, the absence of hair represents the only change in the ax's condition which was noted between the time of the alleged assault and its seizure five days later.

tures of the ax, as well as the evidence of the ax's alleged changed condition, should then go to the question of the weight to be accorded this evidence, which is precisely what the trial court ruled. In other words, although the jury remained free to reject the government's assertion that this ax had been used in the assault, the requirements for admissibility specified in Rule 901(a) had been met.

█ Finally, the trial court did not abuse its discretion in failing to exclude the ax for being more prejudicial than probative under Evidence Rule 403. "District judges have wide latitude in passing on the admissibility of evidence, and admission will not be overturned on appeal absent an abuse of discretion." *United States v. Kearney*, 560 F.2d 1358, 1369 (9th Cir. 1977), *cert. denied*, 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977). The ax, as the suspected assault weapon, was very relevant to the government's case and the jury was entitled to see it.

### VII

### CONCLUSION

█ As in *Crutchfield*, 547 F.2d at 502, we adhere to the following practice:

When the trial judge has failed to take into account the reasonable possibility of a lesser offense, the indicated procedure is to remand for a new trial with a properly instructed jury, with the authority in the trial judge, after hearing both parties and obtaining the Government's consent, to enter a judgment of the lesser offense if he considers this course in the interest of justice.

*United States v. Huff*, 442 F.2d 885, 891 (D.C.Cir.1971) (footnote omitted).[35]

The judgment and commitment order entered by the district court on July 24, 1978 are reversed and the case remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

**35.** A reduction of the judgment to either of the petty offenses would require overcoming the jurisdictional obstacles discussed in Section III(C), *supra*.